Stagi v. National Railroad Passenger Thank you, Your Honor. Good morning. I'm Alan Sandals. I'm here today for Appellant Sharon Stagi and Winifred Ladd, who are here in the courtroom. In the interest of transparency, I'll mention that Scott Lempert, who has done most of the work in this case, is running around the country on a retiree medical matter, which won't come before this Court, so it's a Tenth Circuit case. If it's anything like this, I'd be delighted to hear that. Okay. Well, I'd like to focus on three issues, if I may, and may it please the Court. One is the procedural question, one is the slash factual and subjective question of aggregation of statistics, and one is the question of practical significance. Let me just, if I could, force you to go to number two before number one. Yeah. Help me understand why stratification is not to be desired over aggravation, aggregation. Aggravation is what the case is about. Okay. Well, certainly for my clients, it's been aggravation as well. Aggregation, well, first of all, it's important to remember this is a case about opportunities to compete for promotions. Right. If you aggregate, why don't you pollute the common pool by including within the pool persons who would not have otherwise, irrespective of the blocking rule, not sought a management position? Well, I think the Court agreed that we had a limited set of data, and the experts did the best they could. The Court agreed that the approach taken by Mr. Killingsworth was a reasonable one, given that this is a deterred application case. You can't even tell who would have applied. All you can really do is find out who was blocked. And the feeder pool requirement basically was a check to make sure that you were not going to include a first-year car cleaner as a potential applicant for a management job, not to pick on that job. So looking historically at these trends, and we probably undercounted the number of positions that might lead to promotions, but the universe was – You do that so by the way you define the proxy. Don't you already take care of that concern by the way you define the proxy to get the 716 or whatever the number of pools is? When you define the proxy that way, haven't you already addressed that problem, that that person you just mentioned is not going to apply for a managerial problem? Yes. It's not a way of saying the same thing, that the definition of the feeder pools or feeder jobs limits the universe that you're going to study to people who probably are going to be capable of applying and potentially being in the mix for a promotion. So that's point one. That's really the best anyone could do. So then the problem comes with the aggregation of the pool. I'm sorry? So then the problem creeps in, and that seems to be where the issue is here, with the aggregation of the pool. Okay. Well, again, if we look at Connecticut versus Teal, it's basically the blueprint for the case. Teal says the statute is not concerned just with actual promotion decisions, actual hiring decisions. It's also concerned with artificial barriers to opportunity. It's the opportunity to apply for the job, the opportunity to apply for the promotion, that is equally a concern under Title VII, and we don't even look at bottom line outcomes. Teal says that. So in that sense, everyone who could have applied was, by definition, someone within a year of tenure in one of those feeder jobs, and they don't have to compete with one another for the opportunity to apply for a promotion, and we think that the court below, the expert for Amtrak, and Amtrak really made a category mistake. This is not a promotions case where you actually have to do judge a pool of applicants, and this applicant is competing against that applicant for a particular job. That would be a promotions case, but this is an opportunity case, a threshold entry barrier case, where we're really trying to see does this rule fall more harshly on a protected group, in this case women, and the experts found that – I'm sorry, Your Honor. Go ahead. Well, I was going to say, you say, okay, but does it fall more harshly, but doesn't the evidence have to show that the cause is – be sufficient and the disparity sufficient to show that the cause is because these people are women? Well, in this – And how do you show that? Okay, well, again, in a case like – That's the standard, isn't it? Well, the standard, yes, Your Honor, in this sense, I'll agree with you in this sense if I may, that you have to show that the group is burdened, and if I may spell it out in this different way, we know who is burdened because they are exactly the same people who are promotional candidates but who are still within one year of service. That in itself is the causation element, and they are – Well, but it has to be because they're women. Well, but that's what – That's what the statistics show, Your Honor, and that's where we have the evidence that's cited in the brief that women are bumped down from management into union positions. They are clustered into certain union positions. Yeah, but that could be based upon the seniority, the problems emanating from 2002. This blocking rule may have nothing to do with it. I mean, these women may not apply. They may – you may require a high school diploma for every management job, and the women don't have high school diplomas as much as men. How do we know that this blocking rule is the proxy for – I mean, that is the reason? Well, we don't have to know, actually, because – No, we don't have to know, but there has to be a significant enough disparity to say, aha, it's because they are – this is having an adverse effect on women because they're women, not because they don't have high school diplomas or because they, you know, be like a residence requirement. Well, I know – you know, I know I don't qualify so I don't want the job or I'm not interested in the job. You know, how do we – how do you satisfy that? Because you've got this one little click that might get you there. I'm sorry. Go ahead. I'm so eager to respond. I'm sorry. But this is a disparate impact case. No intention has to be proven. An intent to discriminate doesn't have to be proven. The Griggs case, the seminal Griggs v. Duke Power case, there was no examination of why is it that this requirement somehow burdens this group of applicants more heavily than another, and there may be any number of reasons. Right, but – A railroad has a traditionally male industry, for example. But the statistics have to be sufficient so you kind of – Right. There's a click or a smell test or something. And here the district court said, you know, the EEOC says 80%. Here we've got 97%. How have you shown enough for that click to say, you know, there's something here. The causation, the numbers show causation sufficiently. Right. Well, it's a competing expert case, and the judge agreed that the experts, the plaintiffs were qualified. They were using a reliable method, and their method showed eight standard deviations of a disparate impact, which equates to one chance in a billion, I believe. Speak to me in common sense terms. What was the difference, percentage-wise? That women were 10% more likely to be disadvantaged by this rule, and it translates to 5,800 women, I believe, being denied 8,300 employment or promotion opportunities. So the statistics case was there. In fact, if I can briefly move over – But we know nothing about the qualifications of these women. We know nothing about whether if you had management, you know, management did require a high school diploma, that maybe 95% of the women in these jobs didn't have a high school diploma. So the blocking rule really didn't cause anything at all. Well, let me step back again. Amtrak does not have a preordained set of requirements to apply for a promotion. That's point one. That's admitted and conceded. Point two is that by limiting it to the feeder jobs, you presumptively are limiting that study to the population that ought to have the set of skills and experience to go up to management. That's the best anyone can do. That's admitted in the record that given the fact that Amtrak never produced qualifications data, despite our request, all we could do is look at a certain limited data pool, and this was an appropriate way, as the judge agreed, to limit the data pool. I mean, it's curious to me that you didn't pick some jobs where there would be, there was a higher block rate among women, and pick just a few feeder jobs that would really, you know, make sense as compared to lumping in a lot of them where women are in the ineligible jobs. Well, that gets to another problem, Your Honor, with the aggregation versus stratification method. If you start to slice it up job by job, you often find that the number of people studied is too small to do a reliable statistical calculation, and as we say in the brief, it also had the pernicious effect of masking the fact that some jobs were more heavily female, and that all comes out in the wash. When you net the pluses and minuses, and that might be typical in a promotions case, but this, again, this is not a promotions case. This is an opportunity to apply for promotions, and on the 80 percent rule, Your Honor. What cases are most similar to this in terms of, you know, this nature of disparate impact case? Because so many of them are you pass the test, you know, the test, it's not a threshold. The test is it. You pass the test, you're in the pool, and they pick. So you go right through. Here, it's like, you know, I think of the highway and sometimes when there's heavy traffic, they have, you know, red lights that allow you to get on the highway. It's almost like a residency requirement or something where, you know, this is a given. This has to happen before you can then do everything else you have to do to get a job. What cases are most like this in terms of a threshold, very threshold requirement? Most disparate impact cases that we're familiar with, Dukes, Griggs versus Duke Power, you have to pass a test in order to even have your application considered. This is promotions. But the test is a key element. To get in the door. Yeah, but it's a key element. It's a key ingredient in your hiring. Here, this is like.  I'm sorry, Your Honor. All right. Okay, so that case. What other one would you say is really right on like this case in terms of. Well, there's no case quite like this in terms of a time and service rule. But the Connecticut versus Teal case, again, is about a requirement. In order to get into the mix, you had to satisfy a requirement. It didn't mean you would get the job you were looking for. What was the requirement? Frankly, I've forgotten offhand, but it's obviously in the opinion. Qualification based? Yes. Qualification based. Well, it was a test that I'll certainly be back on, rebuttal with the information for Your Honor. But, I mean, it was something related to doing the job. It was something related to your qualification. Here, it's like a, okay, pass, go, and pay $200. It's unrelated in that sense. And that's why when we get to business necessity, as we hope to, we'll be able to show that it's not validated. On practical significance, Your Honor. I think you're focusing on, I think, if I'm not mistaken, you're not talking about the blocking rule. Right. And you're talking not about the blocking rule, but about whether or not there is anything you can look at that would show qualification for the job. I'm not sure you're answering the questions being asked. I'm sorry if I haven't. Well, I'm sorry if I haven't. Basically satisfying that problem. Well, in order to, you need to get a card in order to even put your application in for a promotion. That card is the fulfillment of the one-year requirement, which has no connection to whatever job you hold. Right. It has no connection to the job you're seeking. So there's no reason to control for the job you hold or the job you're seeking because, again, it's an opportunities case, not a promotions case. On the 80% rule, Your Honor, if I may finish this one. I'll take it out of my rebuttal. It's fine. I can put 10 minutes on your time. Oh, no. Thank you, Your Honor, for being so indulgent. But there is a hierarchy of statistical tests. The 80% rule is really a shorthand rule of thumb that the employment agencies, EEOC, use so that they didn't have to go through an elaborate, expensive, time-consuming statistical study. It's a quick look. But that's not the only test. And, in fact, the Q&A that accompanies those guidelines says that. The Watson decision of the Supreme Court says that. So at the bottom we have the 80% rule. My understanding of that rule is not a look at whether or not there is discrimination, but whether or not the amount of discrimination justifies spending administrative resources to go after it. It's a prosecutorial decision, if you will. Sure. And then the next highest level of confidence would be the 5% level, which I think is roughly 1.96 standard deviations. And then you have the one to two standard deviations. The 5% level, again, I thought of those two different things. The 80% rule is a rule of, as you said, prosecutorial discretion. Is what is going on here sufficiently disparate enough to justify limited administrative resources? 80%, that means we can justify spending our time and money to go after it. Right. 5% simply means that that is indicative of the fact that this is not a random occurrence. There's something other than pure chance. One chance in 20. Right. But that's not a test per se. It's simply a statistical construct to indicate the significance of any of your findings. Are your findings statistically significant? Maybe not practically significant. Yes. But statistically significant. Well, they are between 3.5 and 8.5, which in the 8.5, as I mentioned a minute ago, is one chance in a billion that it is not, that it's random, which is extremely high. The 8.5 for a standard deviation? 8.48 standard deviations. And there's no dispute that if you use that methodology, that's what you get. The real question is do we stratify or not stratify? I'm sorry. Using your aggregation, how many standard deviations came out here? Eight? Between 3.5 and 8.5. Now, the difference between the percentage of blocked male candidates and the aggregate feeder pool, just 25.35% were blocked. Right. Okay. And the percentage of blocked female candidates, 27.77% of them were blocked. Right. And you say that gives rise to a 90% disparity? Well, women are 10% more likely to be blocked. That's one way to put it. But when the statisticians do their work, it's not disputed that you come up with standard deviations between 3 and 8. And the real question is that the difference between the actual number of men who are blocked from applying and the actual number of women who are blocked are the proportionate numbers? I believe it's the proportionate numbers, yes. It's the relative portion of the male workforce versus the female workforce that is blocked. That's the percentages you recited, Your Honor. And the comparison of the two yields a 10% difference, and that may seem innocent and who cares, but it translates out to thousands of women, and statistically it's between 3 and 8 standard deviations. So we have the best proof, the best statistical proof in this case, that it matters, and the question of the substance for the court is, can this practical significance test, which appears nowhere in the statute,  guidelines are looked to, but it's only a guideline. But it seems to me you're satisfying a prima facie test. If you're satisfying a prima facie test and the disparity has to be sufficient enough to show causation, that this is the cause, it needs to be pretty strong if it's an otherwise extremely neutral test, which I guess they all are. Well, you're saying anything that 8 standards deviation is extremely powerful. You're saying anything that's really just not random is enough. Yes. Supreme Court decisions that we cite in the brief say standard deviations of 2 to 3 is enough to make up the prima facie case. We have 3 to 8. I think the substantive question on practical significance is, how is it that an EEOC guideline, which throws that concept in in passing, can somehow overturn a statistical showing of 8 standard deviations, affecting thousands of women in this case? And I don't see that Title VII, on the one hand, allows individual lawsuits for discrimination. Why would Title VII not be concerned when a disparate impact case shows that thousands of people have been affected by a practice? If one person can sue, why is that a viable claim, yet this is not? To me, and speaking only for myself, the issue is the stratification versus the aggregation, not whether or not the number that comes out of the aggregation is sufficiently significant, be it statistically significant or practically significant to show causation. Maybe that's a jury question. The bigger problem for me, anyhow, is what is wrong with stratifying? I know from your contention that's not the issue. It's to why aggregation is right, not why stratification may also be right. Again, look at Connecticut versus TL, which I don't want to direct you to do anything, but that's what we're urging. And the stratification test results in nonsense results. You can have a different adverse impact on the same day for two different job fills, even coming from the same position. Why is that? Because when you slice those 716 or so job fills, it's just happenstance that the group that was in the job that led to the promotion or that fed the promotion had this set of people versus that set of people. So literally – You're saying it takes a snapshot. Right. And you can't take a snapshot at any one point in time because that eliminates the possibility of what another snapshot a day later would show. Well, I'm actually not saying that, but that also would be true, I suppose. But what I'm saying is that it's just happenstance that this promotion was taken from this feeder job, and at the moment that that feeder job worked, these were the people in the feeder job. And there are some feeder jobs where women are more heavily represented, and we go into that in the brief. And when you say the expected percentage is higher for women because there are more women in this feeder job, you're basically obliterating any discrimination that led to them being in that feeder job. Another problem is that you're basically by netting out pluses and minuses from one pool to the next, you're just leveling out all the statistics. And I don't know of any statistical test that actually allows that to be done and to have any validity. Now, again, if we step back, we have nonsense results. It's an opportunities case, not a promotion case. You don't have to compete with the person at the desk sitting next to you in order to have the right to apply for the promotion. So there's no reason to compare my qualifications to the qualifications of the person sitting next to me. And, again, Amtrak did not produce qualifications data. I think it didn't think that it was going to become an issue, and this is all we have to work with, and it showed a very high correlation between the fact of being blocked, again, eight standard deviations, and the fact of being a woman. Your honors have been very indulgent. Thank you very much. I'll yield the rest of my time, as they say down in Washington. Thank you. Good morning, your honors. May it please the court. William Delaney. The brains of my operation is James Bales. We're from Morgan Lewis, and we're representing National Railroad Passenger Corporation Amtrak. Let me start and ask you, pick up where we left off, because I think we were, in my view, sort of getting to the heart of the matter. And I'd like to explain to you what I understand your friend across the way to be saying, and you can set me straight if not. I want you to tell me why he's wrong, and I want you to tell me the best case you have that says he's wrong. As I understand what he's saying, he says that the relevant pool here should be all persons otherwise qualified for and interested in any management job filled from 2002 to 2009, and that everybody is in agree that this proxy is a reasonable proxy for determining all those people who are otherwise qualified and interested in any management job filled. Okay. He says all of those people are subject to the one-year rule, and it operates since it is a bars blocks from consideration. It affects each of those people in that pool the same, and therefore aggregation is appropriate after you structure the 716 pools. And for him, as I understand it, the distribution among the filler jobs is simply irrelevant because it blocks everybody exactly in the same manner who would otherwise be qualified for the management job. And if that's what he's arguing, why – oh, and it appears that the different results that the two experts get may be largely attributable to the distribution of men and women and eligible and ineligible in the various filler jobs. Now, why, if it blocks everybody who's qualified and interested in accordance with a proxy, why do we need to look at the distribution of black people and male and female people in the various feeder jobs in the second stage of the analysis? Okay. Your Honor, if I may, and with your indulgence, a long question, so I'm going to give a long answer. That's all right. You can take as long as you need. We're here on the issue of causation, as Judge Rendell correctly pointed out. And on the issue of causation in disparate impact cases, Your Honor, the plaintiff, to satisfy the prima facie case, must demonstrate statistical evidence that demonstrates a sufficiently substantial link in causation to the employment practice in question. And that's the one-year rule. And the reason for that, Your Honor, is we are not in the courts recognize that in an employment circumstance, you're not in a chaotic environment. You have rational actions, and one would expect to see statistical disparities in the results. To have reliable statistical evidence, you have to account for those other circumstances that would impact the results and perhaps cause statistical disparity in the results. So it's incumbent upon you. I'm not sure the answer is. Is that what you're going to say? I'm almost there, Your Honor. I'm almost there. All right. Okay. So to have reliable statistical evidence, the expert, and the plaintiff's sole evidence here is the expert opinion of Dr. Killingsworth. So we have to look at what he did. And what he did was he made the determination that because you have a discouragement or a situation where you may not have everybody apply because of the one-year rule, he's going to create a proxy for what he recognizes is an important and legitimate consideration or factor in this workforce, which is qualification and job interest. Right. So the model that he sets up is a stratified model. He creates 716 job pools, and he does it based upon the notion of a feeder job. And you agree with that? I agree with that, Your Honor, and the district court agreed with that. That is not the subject of the appeal. Right. What the issue is and what the district court correctly found was there is no logical reason to then scrap that important proxy, that important qualification and interest proxy, and aggregate. This isn't a case that's attacking aggregation in general. It's attacking Dr. Killing's rules. He should have gone pool by pool is what your contention is. He should have done one of two things. He shouldn't have stratified in the beginning, and he should have done an analysis. No, but you say he shouldn't have stratified in the beginning. I thought you just said that you both stratified. Your Honor, I'm referring to his opinion only. He stratifies. When you say stratify, you're not saying he shouldn't have come up with a method to define qualifications by using proxies and developing 716 feeder jobs. You're not saying that. No, Your Honor. That is not the subject of the appeal. I'm trying to work my way up to the subject. The fact that he did it that way means that his feeder jobs, by definition, rely upon qualifications and job interest as their basis. Then when you do your statistical analysis, scrap them and aggregate, it's inconsistent with his premise. It's not all the way there. When you develop the 716 pools, it's not all the way there, and you may within those 716 pools have captured a situation where people are defined into that pool solely because of the impact of this blocking rule. Because the blocking rule hits everybody the same, why not put everybody together into one big pool and then determine whether or not people coming out of that pool were blocked at a disparate rate by the operation of this facially neutral blocking rule? Let me give you an example, Your Honor. If the manner in which he undertook his model, the database model, the 716 pools, is correct, then he has created a situation where the feeder job is the proxy for qualification and interest, and it's important. And if that's the case, then it needs to be followed through in the remainder of his statistical analysis. Why? I don't get that. Well, here's a perfect example, and I'm going to make up jobs. And it's not to say that one job is lower than the other to disparage anybody. But take, for example, a cleaner at 30th Street Station. And in no circumstance did a cleaner at 30th Street Station ever get promoted to a manager. So that job never gets into the statistical analysis that Killingsworth performs. But a cleaner on the trains. It doesn't get into your analysis either. Your Honor, our analysis isn't an issue. This isn't competing experts. It doesn't help me. Believe me, by telling me what you're not doing, it doesn't help me work my way up to what you do. I think he's getting there. But if I can help you understand, Your Honor, by contrast, a cleaner of trains who happened to be in one circumstance a feeder job to a management-level position does get into Dr. Killingsworth's analysis. And there's no reason, if qualifications and interests are important and form the basis of the statistical analysis, then they should do so through the end. If they're not important, then he shouldn't have stratified at the outset. It's his model that... Well, it depends on what disparate impact means. Really, it does. I mean, they say what we're doing here is trying to determine where there is a disparate impact on people who would otherwise be qualified and interested in any job, management job, filled during this period. Now, if there's a disparate impact on that, that group, they say that's all we need to show. We don't need to show anything more. And you show that, the percentages in that group, by looking at the eligible, the blocked, and the unblocked, and the males and the females in that pool. Why do you have to do... Why is that an error? The issue, Your Honor, is that the underlying methodology that gets you to those numbers is flawed. And it's flawed because... Which numbers? The statistical deviations that he referred to. He referred to 8-point-something standard deviations, which as a result of another test... So you're saying they didn't aggregate right. They didn't. They stratified and should have continued with stratification to be consistent with their own model. But he's saying that, but why? Other than for the sake of consistency, why? How does the result differ? Well, for example, Dr. Griffin, who took Dr. Killingsworth's model, so his stratified database, he took that model and did view it on a position-by-position basis, and then he aggregated it for the overall institution, and he determined that females were, in fact, six candidacies ahead than they would have been otherwise. From a practical circumstance, just by contrast... Before I get to the contrast, the problem that I have with that is, how do we know that within that group, that stratified group, we're not locking in the very bias that we're testing for? We're locking in people who are in certain jobs because they're gender-preferred jobs or the jobs that have tended to attract females with a greater frequency than males. Therefore, if you take a random sample of people coming out of that group, you're going to get more women coming out of that group to a managerial position just because there are more women in that group to begin with. And if you don't spread that out across a number of different groups, you have a situation where, in every individual group of the 716 groups, you institutionalize, if you will, all of the gender disparate impact operating on that group by seeing how many people from that one group went to a managerial position. And it seems maybe the only way to eliminate that is by putting all groups together to determine overall whether or not there's a disparate impact in terms of women getting into managerial positions, in terms of the pool of workers. Because, Your Honor, the problem is with his methodology. At the outset, he made the determination that qualification and interest were important to the analysis. So he cut out thousands of workers. Okay, but how does... Judge McKee is saying that spreading makes it more appropriate and gets the right answer. How is it that spreading those women... And I'm trying to think of these feeder pools with how many women in this type of job, maybe it's the conductor, and then that goes and they become a service manager. Why is it so necessary to keep that discreet? And why is it that aggregating distorts in an improper way? It's the very fact that he's doing it midstream. It's important to... Well, maybe he did it wrong in the beginning. What's so right about stratifying? No, Your Honor, it's not that he did it wrong in the beginning. It's that he's changing it up midstream to arrive at a result. He's performing his statistical analysis on a subgroup of people. The sole basis to select a subgroup of people is qualifications and interest. And if you don't carry that through, you're not measuring anything. You're just measuring a subgroup of the overall. He's saying this huge group of people got these jobs. Right. But the only reason you're creating the proxy is you're trying to account for qualification and interest. How else do you qualify? Since they don't have individual data on qualifications, absent the proxy and the fellow jobs, how in the world can you get at... How can you make the inquiry? Your Honor, I mean, there's several statistical techniques that their expert didn't do here. You could have pooled jobs. You could have left the aggregate and... He could have pooled jobs. What do you mean? You could have taken the overall aggregate jobs with union people, identified those where there was a union candidate, and then broken out the pool by qualifications. You mean grouping the 716 in different ways? Yes, Your Honor, in different levels. It sounds to me that you're saying they could have done what they did except to put in the word qualifications since there was no hard data about what qualification was necessary. They used the proxy, which sounds logical. If one person had job A, non-managerial, and subsequently went to job B, managerial, why couldn't you look at all the people who had job A as fulfilling the qualification for job B? It's probably over-inclusive. Your Honor, I didn't speak clearly enough. I was referring to identifying the jobs for which a union person actually was a successful applicant to get the job, the number of jobs. But then you would look at the entire union pool because you've made the determination that at the outset qualifications and interest don't matter, which isn't what happened here. This is not a threshold situation by definition of their expert's model because you put qualifications and interest up front as the discriminator before you get into the statistical analysis. When you say qualifications and interest, aren't you just saying he defined the filler job up front? That was the qualification. No, Your Honor, he used filler job as the proxy to account for qualification and interest because he recognized that it's an important consideration. The undisputed evidence is that qualification, minimum qualification and interest impact those who take positions at Amtrak. Right, and anybody else for that matter. But I'm still at a loss here. I thought that we had a situation where everybody agreed, including Mr. Griffin, that using the feeder job as a proxy for qualification for the managerial position to which the feeder person went was appropriate. That was sound. There was nothing wrong with that. And you even agreed because that's how you get the 716. We did not challenge that, Your Honor, but if you're going to live in a stratified world, you have to follow that stratified world into your analysis. Let me see if you assume that the 30 people who are eligible to be conductors, one conductor goes to be the service manager. So you immediately say you've got the filler and you've got the feeder. That works. And you have 716 of those. When you suddenly mush them all together, you're saying that that conductor could fill any of the other 716 jobs on this side of the equation and that's not the way you've constructed it. You've constructed that, no, he can fill the service manager job. He can't do the treasurer job. He can't work in labor relations. And you're mushing it all together? Exactly. It's the mush theory.  That is exactly what I'm saying. What I'm saying is that the problem that they've identified to set up their data set carries through to the analysis because once you get to actual jobs, they've recognized qualification and interest are important, so you're comparing, built into the model is the fact that that is now important where we are and then they scrap it to perform their analysis. And Griffiths went and looked at the 716 and analyzed them all and the women came out better? Yes, Your Honor. There were some jobs and the men came out better with some jobs. Yes, and in the aggregate, women were six jobs ahead. And as to practical significance... Well, didn't the probate analysis and the chi-square analysis get at that problem in terms of once you get this amalgamated mush, as it has been so articulately called, and you've got people in there who may have other qualifications and other motivations, they did a mathematical construct on that group, which I don't pretend to understand, but I do understand that I thought that out of that subsequent inquiry, they had neutralized to the extent they could, they had control for all those other things. No, Your Honor, as I understand that process, that is to deal with the fact that you have multiple people who may have had multiple opportunities within the... Do other things probate and chi-square go to that? I'm sorry? Was the probate analysis and the chi-square analysis go to that same thing? No, Your Honor, that's actually the statistical analysis that he performs on the difference between the ineligibility rates of men and women. And to clarify that point, there's no 10% here. The difference by their own experts' numbers, the difference by which women were impacted by the one-year rule to men is 2.4%. So then his expert takes that number and does a probate analysis to determine whether or not that's chance or whether or not it's not. And he gets 8-point-some standard deviations. And then he performs an analysis... Take it step by step. Is there anything wrong with determining whether or not that 2-point-whatever-it-was could be the result, the likelihood of it being the result of randomness? The way he looked at whether or not that is the null hypothesis of something else, is that wrong? No, the actual manner in which he performs the numbers is not incorrect. It's the underlying numbers that are the problem. No, I understand that. We're getting back to aggregation. Yeah, no issue there, Your Honor. Okay, that's all right. So if there's not an if, and I know it's a big if you don't agree with, if aggregating is okay, you're not disagreeing with the fact that the divergence that comes out of that is not likely to be caused by randomness. There's something more than chance that we need to explain the difference between the number of women and the number of men blocked by the one-year rule if aggregation is okay. That we agree on. His mathematical construct to get to the 8.3-whatever-it-was standard deviations or 3 standard deviations to 8 standard deviations, that's okay. The problem is those deviations arise out of the aggregation. If aggregation's okay, you're saying, then they've shown it's not random. Well, the problem is that we're aggregating after we stratify. That's the heart of the matter. Let's just have a basic conversation. But yes, Your Honor. I don't have a problem with the calculation of the number. But how about Judge Brody's concept of practical significance in the EEOC? Well, she brings in practical significance to really butcher support for the fact that his analysis is not the proper one. There's a 97% selection rate. The fourth-fifths rule is 80%. If the selection rate of... What's the purpose of the fourth-fifths rule? Well, if the selection rate of women were to be below 80% of that of the other class, in this case men, then the EEOC recognizes that that's enough to put a bell off and say there might be disparate impact here. We're at 97%. That's almost parity. And what, again, based on... Well, how about the 8th standard deviation, then? There seems to be a disconnect here. If there is 8th standard deviation and the case law said that's enough, then how come almost parity is enough to show disparate impact? Your Honor, because what we have is we have an aggregation of the pool. So when you aggregate, you're more likely to find... No, I know that. No, I know that. But let's assume you stratified or whatever. And it came up with the 8th standard deviation. And the 97%. And the 97%. Your Honor, I don't know how that could be, to be honest. Well, assume Griffiths did the test and it came up with 97% and almost parity and 8th standard deviation. Would you agree that they get past Go? I don't understand the 97%, how that is so strikingly one-sided, and yet if that equates to 8th standard deviation... I understand your question, Your Honor. I think that in all honesty and sincerity, they would get the Go in that circumstance. If that truly were the numbers and the 8th standard deviations was built upon a reliable methodology, then yes. I have trouble that you would ever have that circumstance, but yes. Okay, all right. Well, you could have a small... that only a small number of individuals were disadvantaged by it, so you get a very high conformity rate between the advantaged group and the disadvantaged group. Yet to have that small number, given all the things that you could test for, was very likely not random. It had to be something other than pure randomness. That would give you a very high standard deviation and a very low difference between the targeted group and the adversely affected group. It's possible, Your Honor. 5% just goes to whether or not this is random. Yeah, I mean, we're dealing with... As a result of the aggregation, we're dealing with a very large pool here. Which maybe that's... I think you'd agree the smaller the sample size is, the more problems you're going to encounter in trying to get some meaningful conclusion from your data on that small group. Not necessarily, Your Honor. I would agree with the opposite of that, which is the larger your sample size is, the more you've got to look at the statistical significance number, because small differences are more likely to be statistically significant in a larger pool, which is why you would go to the four-fifths rule to say what does this really mean. Why doesn't that confuse statistical significance and practical significance? If it's statistically significant, don't you have a... Well, I guess you're right. If it's a smaller pool, the likelihood of the difference being purely a distributable chance may be greater. You may be right about that. I'm pretty sure I'm right on that one, Your Honor. I may have been wrong on everything else today. I'm pretty sure about that. So that you're pretty sure you're right about. Don't hold me to anything else I say today. Okay. But let's go back to where we started from. If you gave it to me, I didn't get it. But can you give me the best case you think that indicates that aggregating at the second stage after doing the 716 pools is inappropriate to determine whether there is a disparate impact here on women affected by this rule? Something other than consistency. Because I understand your answer to that question so far as being, well, you didn't aggregate to the beginning, and then you aggregate in the middle of it. At least for me, that doesn't help. Well, to answer your question, Your Honor, I don't think there is a case that's just like this one. I would be remiss to answer otherwise. I just don't think it's there. This is a very unique rule because it moves in time, and it moves in terms of people moving jobs. So you're kind of trying to hit a moving target here. What I would say, though, is that we're really in Ward's Cove and Watson, which is that for the statistical evidence to be relevant and meaningful, it must reflect the relevant labor pool. And plaintiffs bear the burden of proof. They constructed the relevant labor pool to be dependent upon the actual feeder jobs to allow for qualification and interest. And it was incumbent upon them, then, to have a reliable method, to follow that method through when they performed the actual statistical analysis. And I think Judge Brody accurately held, or correctly held, that because he changed up midstream, stratification to develop the database, but not holding true to the need to look at it job by job when he actually performed the analysis is where the breakdown is. Another method or another way to have determined from an aggregate perspective what the statistical significance is here, we don't know because Dr. Killingsworth and the plaintiffs who bore the burden didn't do it. Well, they said they couldn't get the data. Your Honor, may I address that? Because I think if there's going to be any concern about what they... I don't think it's going to control the analysis at all. The time is up, and I won't let Mr. Sandals get into it if he tries to. Thank you, Your Honor. Thank you for your patience, Your Honors. I think I'm standing between you and Memorial Day weekend. There's another case behind me, I know. Sorry. But just briefly hit a few key points. I'll answer that one first, because as you can probably see from all of our questions, at least my frustration from getting the answer, why, one, why did you aggregate after you got the 716 feeder pools, and why was it necessary, number two, and number three, maybe the same thing, why is it better to do it? I'm not concerned with the fact that you changed the methodology midstream, maybe you had to, maybe statistically... That's where I was going with my scribbles anyway. Okay, let's do that. This is an opportunities case, not a promotions case, so what the statisticians are trying to do is figure out of the total employee pool in the union positions at Amtrak, who is likely in a position to submit an application for promotion. That's why we... Did we get that? Likely to submit an application to promotion for which job? I shouldn't have said likely. Let me rephrase that, Your Honor. Well, you said opportunity, and if you're going to say that the street sweeper is likely and needs the opportunity to be a treasurer... Oh, no. You know, how can you do the mush in the mush if it really is an opportunity? Does he have any opportunity to be all of those management jobs? Well, any of them is really the question, Your Honor. So Amtrak is a place that has defined job titles, car cleaner one, car cleaner two, and I assume it's a function of years of experience and so forth. So we're clear, and I hate to interrupt, but just so we're clear, certain managerial jobs were not part of this, like general counsel, treasurer. Certain things required specific expertise that didn't allow for the appropriate fit with a feeder job. Those were out of the equation. Is that right? I think so, yes, Your Honor. But, again, the point I wanted to make in passing, I said a minute ago, it's not the opportunity to apply for a promotion for a particular job that's an issue. It's really any of the jobs that are in management. And by limiting it to the feeder pools, we know that people in those feeder pools have a track record of being promotable to management positions. To the fill jobs. So why did you abandon the line-by-line analyzing each of the 716? Well, my friend Mr. Delaney said that we started to stratify the data and then we didn't. In fact, we didn't stratify the data. All we were trying to do, Judge Rendell was to find what is the subset of total union employees who seem to be in positions that made them eligible to seek promotion. To a certain job. Any management position. But to the 716. Why didn't you do it on a 716 line-by-line basis, which is what Griffiths did and when he came up with something where there's more women? Why was that invalid? Because they weren't competing with the peers in the feeder job for the right to apply. Anyone can apply under Amtrak rules, no matter what their experience level or qualifications. That would have been too broad a universe, so we narrowed it down by looking at the historic record. And we didn't stratify. We simply were trying to define a relevant universe to measure. And the feeder job is not a controlling variable that has anything to do with a blocking rule. The job you go to does not have any connection to the blocking rule either. And, by the way, when Kensworth complained about our approach, we did an alternate analysis that had a larger number of people. And, in fact, the standard deviations were in the 17 and 18 range. But I'll pass that and just suggest to your honors that we cited on the law the McReynolds versus Sodexo decision, which is by Judge Uvell of the D.C. District Court. And it's among the most recent decisions, and it certainly canvases the case law. And it would be worth a look on the legal precedent for aggregation. What was that again? McReynolds, M-C-R-E-Y-N-O-L-D-S, versus Sodexo Marriott. And there are several decisions in the case, and we cite the one, of course, that has to do with the aggregation issue. On the practical significance, to go back to that briefly, even the Amtrak expert agreed it was in the eye of the beholder. So it's basically a standardless test. And we are under Title – What is a standardless test? The practical significance from the EEOC guidelines, there's no standard that you can use to define it. It's, as Griffin said, in the eye of the beholder. Title VII wouldn't permit us to engraft a requirement that's not in the words of the statute. And all the more so, it doesn't permit us to engraft the statute – engraft a requirement that's totally standardless. It has no content whatsoever. Lastly, Your Honors, I think the way I started was it really was not a summary judgment case. We have two competing experts. They use valid approaches. They produce opposite results. That's exactly what Rule 702 contemplates. And it really wasn't summary judgment material for Judge Brody to decide, this is more persuasive than that. To the extent there are legal issues involved in aggregation and practical significance, I'm sure you will straighten us all out. Thank you very much for your time. If you were to win and this becomes a jury trial, you've got to promise not to give any of the jurors her name. Okay, Your Honor. No problem. Thank you very much, and have a very nice holiday weekend. Thank you. I know it's dried down a bit. Let me just take another – Do we want a transcript? Do you want a transcript? I was suggesting we might want to read this again. Do you want a transcript? Hmm? Do you want a transcript? Shall you attempt one? Do you want a transcript? Oh, yes. Okay, well, the attorneys get a transcript, and just take a brief break and consult with Mr. McCauley about the logistics of how we get a transcript. Thank you very much, Your Honor. Thank you. Have we taken another break? Oh, my God. We're three minutes.